David R. Olsen (2458)
Charles T. Conrad (12726)
DEWSNUP, KING OLSEN WOREL HAVAS MORTENSEN
36 S. State Street, Ste. 2400
Salt Lake City, UT 84111
Phone: (801) 533-0400
Fax: (801) 363-4218

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

---

| | |
|---|---|
| JANE DOE 1, INDIVIDUALLY AND FOR THE : | **COMPLAINT** |
| ESTATE OF JOHN DOE 2, JOHN DOE 1, JANE : | **JURY TRIAL DEMANDED** |
| DOE 2, INDIVIDUALLY AND FOR THE : | |
| ESTATE OF JOHN DOE 5, JANE DOE 3, JOHN : | Case No. 2:16-cv-00910 |
| DOE 3, JOHN DOE 4, JANE DOE 4, JOHN DOE : | |
| 6, JANE DOE 5, INDIVIDUALLY AND FOR : | District Judge David Nuffer |
| THE ESTATE OF JOHN DOE 7, JANE DOE 6, : | |
| JANE DOE 7, JANE DOE 8, JOHN DOE 8, : | |
| INDIVIDUALLY AND FOR THE ESTATE OF : | |
| JOHN DOE 16, JANE DOE 9, JOHN DOE 9, : | |
| JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, : | |
| JANE DOE 10, JOHN DOE 13, JOHN DOE 14, : | |
| JOHN DOE 15, JANE DOE 11, INDIVIDUALLY : | |
| AND FOR THE ESTATE OF JOHN DOE 19, : | |
| AND FOR THE ESTATE OF JOHN DOE 20, : | |
| JOHN DOE 17, JOHN DOE 18, JOHN DOE 21, : | |
| JANE DOE 12, JOHN DOE 22, JOHN DOE 23, : | |
| JOHN DOE 24, JOHN DOE 25, JOHN DOE 26, : | |
| JOHN DOE 27, JANE DOE 13, JOHN DOE 28, : | |
| JOHN DOE 29 and JANE DOE 15, JANE DOE 14 : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| HEZBOLLAH : | |
| : | |
| Defendant. : | |

Jane Doe 1, Individually And For The Estate Of John Doe 2, John Doe 1, Jane Doe 2, Individually And For The Estate Of John Doe 5, Jane Doe 3, John Doe 3, John Doe 4, Jane Doe 4, John Doe 6, Jane Doe 5, Individually And For The Estate Of John Doe 7, Jane Doe 6, Jane Doe 7, Jane Doe 8, John Doe 8, Individually And For The Estate Of John Doe 16, Jane Doe 9, John Doe 9, John Doe 10, John Doe 11, John Doe 12, Jane Doe 10, John Doe 13, John Doe 14, John Doe 15, Jane Doe 11, Individually And For The Estate Of John Doe 19, And For The Estate Of John Doe 20, John Doe 17, John Doe 18, John Doe 21, Jane Doe 12, John Doe 22, John Doe 23, John Doe 24, John Doe 25, John Doe 26, John Doe 27, Jane Doe 13, John Doe 28, John Doe 29 and Jane Doe 15, complain of Defendant and allege as follows:

## NATURE OF THE ACTION

1.     This is a civil action pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), by American nationals serving as part of the Coalition Forces in Iraq and/or their families and estates for treble damages against Hezbollah, a U.S.-designated Foreign Terrorist Organization, which planned, financed, conspired to, and, in fact, did, kill, injure and/or maim the Plaintiffs and/or their family members in Iraq in January 2007. In so doing, Defendant committed acts of international terrorism as defined in 18 U.S.C. § 2331 and violated 18 U.S.C. §§ 2332 and 2339A.

2.     The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Public Law 104-132, empowers the United States Secretary of State to designate an entity a Foreign Terrorist Organization when the Secretary determines that: (1) the entity is foreign; (2) it engages in terrorist activity; and (3) the terrorist activity threatens the security of the United States or its nationals.

## JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 18 U.S.C. § 2333(a) as a civil action brought by citizens of the United States and/or their

estates, survivors, or heirs, who have been injured by reason of acts of international terrorism.

4.       Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§

1391(b) and 1391(d).

5.       Defendant is subject to personal jurisdiction in the United States pursuant to 18

U.S.C. § 2334(a), and Fed. R. Civ. P. 4(k)(1)-(2).

6.       Defendant's unlawful conduct was purposefully directed at the United States.

7.       Defendant has deliberately targeted U.S. citizens outside the territory of the United

States and specifically targeted the Plaintiffs *as Americans* – as set forth below.

8.       Defendant has also, *inter alia*, laundered money through the United States through

illegal sales of cigarettes,[1] used cars[2] and narcotics trafficking[3] in the United States.

9.       Defendant has also financed its operations through funds transfers (often related to

its other illegal conduct) through New York correspondent accounts of Lebanese banks such as

Lebanese Canadian Bank.

---

[1]       *See, U.S. v. Hammoud* (Hammoud led a cigarette smuggling organization responsible for illegally smuggling over $8 million worth of cigarettes from North Carolina to Michigan during the late 1990s. Testimony and trial evidence showed that some of the profits from the cigarette sales were sent to Hezbollah in Lebanon.).

[2]       The U.S. government brought an *in rem* forfeiture and civil money action against Lebanese Canadian Bank as a result of a Hezbollah scheme to launder money through the United States financial system and U.S. used car market. As part of the scheme, funds were transferred from Lebanon to the United States in order to purchase used cars, which were then shipped to West Africa and sold for cash. Cash proceeds of these car sales were then transferred, along with the proceeds of narcotics trafficking and other crimes, to Lebanon. Hezbollah members and supporters were involved in the cash smuggling, including proceeds from the sale of used cars exported from the United States.

[3]       For example, Ayman Joumaa's drug-trafficking organization transports, distributes and sells multi-ton bulk shipments of South American cocaine through West Africa. Joumaa and his organization operate in Lebanon, West Africa, Panama and Colombia, and launder proceeds from their illicit activities, as much as $200 million per month, through various channels, including bulk cash smuggling operations and Lebanese exchange houses, primarily on behalf of Hezbollah.

**PARTIES**

**THE JANUARY 20, 2007 ATTACK - KARBALA**

10.     On the night of January 20, 2007, Iran launched a coordinated terrorist attack against the Provincial Joint Coordination Center ("PJCC") in Karbala, about thirty miles south of Baghdad. The attack was largely planned by Hezbollah under the direction of Hezbollah operative Ali Musa Daqduq and carried out by the Iraqi Shi'a terrorist group known as Asa'ib Ahl al-Haq ("AAH" or "League of the Righteous") and led by Qais al-Khazali.

11.     AAH is a Shi'a Special Group[4] supported by Hezbollah and the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF"), a subdivision of the Islamic Revolutionary Guard Corps ("IRGC") that has conducted assassinations and operations against Iraqi civilians, Iraqi Security Forces and Coalition Forces.

12.     At all relevant times, AAH received significant funding from Iran, and had links to the IRGC-QF and Hezbollah.

13.     Hezbollah operative Ali Musa Daqduq provided training to AAH fighters.

14.     Daqduq reported to Youssef Hashim, the head of Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

15.     AAH was one of the Iranian-backed entities responsible for the January 20, 2007 Karbala attack that killed and/or injured the Plaintiffs.

16.     On January 20, 2007, just after nightfall, a five-car convoy of black GMC Suburban trucks – the type frequently used by the U.S. Government – made its way through three checkpoints, approaching the PJCC.

17.     The vehicles contained approximately a dozen AAH operatives dressed in U.S.

---

[4]     The Special Groups refers to a litany of Iraqi Shi'a terror groups that included AAH.

4

military-style fatigues, carrying American-type weapons.

18.    After they entered the compound, the vehicles split up, some parking in front and others circling to the back of the main building.

19.    After exiting their vehicles, the AAH terrorists threw grenades and opened fire with automatic rifles. U.S. soldier John Doe 2 jumped on one of the grenades that was thrown into the Coordination Center's main office, an upper-floor office that also contained the provincial Iraqi police chief's office. Although he was killed, and three other U.S. soldiers injured, his selfless act provided his fellow soldiers in the PJCC's main building a few extra moments to recover and begin returning fire.

20.    For his act of bravery, John Doe 2 received the Silver Star, posthumously.

21.    At the same time that AAH terrorists were attacking the PJCC's main building, other AAH operatives detonated explosives throughout the PJCC and abducted four soldiers before fleeing the compound.

22.    The AAH getaway vehicles drove east, crossing the Euphrates River and then turning north.

23.    Realizing the likelihood of escaping with their captives was low, the AAH operatives murdered the four Americans and abandoned their bodies and the vehicles near the town of Mahawil. Three of the four Americans died at the scene.

24.    Only one of the four abducted U.S. soldiers, John Doe 5, was still alive when rescuers reached the scene. Two of the soldiers were found in the back of one of the SUVs, handcuffed and shot dead. A third soldier was found dead on the ground, near the abandoned vehicles.

25.    John Doe 5 had also been shot in the head, but died on the way to the hospital.

26.     The terrorist group that planned and executed the attack, AAH, was trained and armed by Iran's IRGC with Hezbollah's assistance.

27.     On March 20, 2007, two months after the attack was perpetrated, Hezbollah leader Ali Musa Daqduq and AAH leader Qais al-Khazali and his brother Laith al-Khazali were captured by Coalition Forces in southern Iraq.

28.     The United States Government charged them with responsibility for the Karbala attack.

29.     Documents captured with Qais al-Khazali showed that the IRGC-QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers."

30.     A 22-page memorandum found with Hezbollah operative Daqduq "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," among others. Other documents discussed tactics to attack Iraqi and Coalition Forces.

31.     Hezbollah operative Daqduq also had a personal journal that documented his meetings with Special Groups members who were targeting other Iraqis and Coalition Forces in the Diyala province using IEDs, as well as small-arms fire.

32.     The U.S. Treasury Department's November 19, 2012 press release announcing Daqduq's designation as an SDGT stated, in part: "*Daqduq is a senior Hezbollah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.*"

33.     Daqduq is Lebanese-born and served in Hezbollah for 24 years prior to the attack. He served as a bodyguard for Hezbollah leader Hassan Nasrallah and also led Hezbollah operations

in large areas of Lebanon.

34. According to the U.S. Government, Daqduq "*was in Iraq working as a surrogate for Iranian Revolutionary Guards Corps Quds Force operatives involved with special groups.*"

35. In 2005, he was directed by senior Hezbollah leadership to go to Iran and work with the IRGC-QF to train Iran's proxies in Iraq.

36. According to the U.S. Government: "*In May 2006, [Daqduq] traveled to Tehran with Yussef Hashim, a fellow Lebanese Hezbollah and head of their operations in Iraq. There they met with the commander and deputy commander of the Iranian Quds Force special external operations.*"

37. Daqduq was ordered to Iraq to report on the training and operations of the Iraqi Special Groups.

38. In the year prior to his capture in 2007, Daqduq made four trips to Iraq, where he monitored and reported on the training and arming of the Special Groups in mortars and rockets, manufacturing and employment of IEDs, and kidnapping operations.

39. Most significantly, Daqduq was tasked with organizing the Special Groups in ways that mirrored how Hezbollah was organized in Lebanon.

40. Daqduq also helped the IRGC train Iraqis in Iran. Using training groups of approximately 20 to 60 Iraqis at a time, Daqduq instructed his trainees how to use Explosively Formed Penetrators ("EFPs"), mortars and rockets, as well as intelligence, sniper and kidnapping operations. The IRGC then sent the trainees back to Iraq where they were organized into Special Groups.

41. The IRGC also supplied the groups with weapons and a funding stream estimated at between $750,000 and $3 million per month.

42.     On April 26, 2007, the Commander of the Multi-National Force-Iraq, Gen. David

Petraeus, gave a briefing in which he stated:

> The Iranian involvement has really become much clearer to us and brought
> into much more focus during the interrogation of the members -- the heads
> of the Khazali network and some of the key members of that network that
> have been in detention now for a month or more. This is the head of the
> secret cell network, the extremist secret cells. They were provided
> substantial funding, training on Iranian soil, advanced explosive munitions
> and technologies as well as run of the mill arms and ammunition, in some
> cases advice and in some cases even a degree of direction.  When we
> captured these individuals -- the initial capture, and then there have been a
> number of others since then -- we discovered, for example, a 22-page
> memorandum on a computer that detailed the planning, preparation,
> approval process and conduct of the operation that resulted in five of our
> soldiers being killed in Karbala. It also detailed -- there are numerous
> documents which detailed a number of different attacks on coalition forces,
> and our sense is that these records were kept so that they could be handed
> in to whoever it is that is financing them. And there's no question, again,
> that Iranian financing is taking place through the Quds force of the Iranian
> Republican Guards Corps.

43.     The Americans killed during the Karbala attack included John Does 2, John Doe 5,

John Doe 7, John Doe 16 and John Doe 19. The Americans injured during the Karbala attack

included Plaintiffs John Doe 21, John Doe 25, John Doe 26 and John Doe 27.

**THE PLAINTIFFS**

**Doe Family 1**

44.     John Doe 2 was a citizen of the United States and domiciled in the State of Alaska

when he was killed in Iraq.

45.     Plaintiff Jane Doe 1 is a citizen of the United States and domiciled in the State of

Alabama. She is the widow of John Doe 2.

46.     Plaintiff John Doe 1 is a citizen of the United States and domiciled in the State of

Alabama. He is the father of John Doe 2.

47.     Plaintiff Jane Doe 1 brings an action individually and on behalf of the Estate of

John Doe 2, as its legal representative.

48.     As a result of the attack, and the death of John Doe 2, Plaintiffs Jane Doe 1 and John Doe 1 have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's society, companionship, comfort, advice and counsel.

**Doe Family 2**

49.     John Doe 5 was a citizen of the United States and domiciled in the State of California when he was killed in Iraq.

50.     Plaintiff Jane Doe 2 is a citizen of the United States and domiciled in the State of California. She is the widow of John Doe 5.

51.     Plaintiff Jane Doe 3 is a citizen of the United States and domiciled in the State of Utah. She is the mother of John Doe 5.

52.     Plaintiff John Doe 3 is a citizen of the United States and domiciled in the State of California. He is the father of John Doe 5.

53.     Plaintiff John Doe 4, a minor represented by his legal guardian Jane Doe 2, is a citizen of the United States and domiciled in the State of California. He is the son of John Doe 5.

54.     Plaintiff Jane Doe 4, a minor represented by her legal guardian Jane Doe 2, is a citizen of the United States and domiciled in the State of California. She is the daughter of John Doe 5.

55.     Plaintiff Jane Doe 2 brings an action individually and on behalf of the Estate of John Doe 5 as its legal representative.

56.     As a result of the attack, and the death of John Doe 5, Plaintiffs Jane Doe 2, Jane Doe 3, John Doe 3, John Doe 4 and Jane Doe 4 have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their husband's/son's/father's society, companionship,

comfort, advice and counsel.

**Doe Family 3**

57.     John Doe 7 was a citizen of the United States and domiciled in the State of Louisiana when he was killed in Iraq.

58.     Plaintiff John Doe 6 is a citizen of the United States and domiciled in the State of Louisiana. He is the father of John Doe 7.

59.     Plaintiff Jane Doe 5 is a citizen of the United States and domiciled in the State of Louisiana. She is the mother of John Doe 7.

60.     Plaintiff Jane Doe 6 is a citizen of the United States and domiciled in the State of Louisiana. She is the step-mother of John Doe 7.

61.     Plaintiff Jane Doe 7 is a citizen of the United States and domiciled in the State of Louisiana. She is the sister of John Doe 7.

62.     Plaintiff Jane Doe 5 brings an action individually and on behalf of the Estate of John Doe 7 as its legal representative.

63.     As a result of the attack, and the death of John Doe 7, Plaintiffs John Doe 6, Jane Doe 5, Jane Doe 6, and Jane Doe 7 have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**Doe Family 4**

64.     John Doe 16 was a citizen of the United States and domiciled in the State of New York when he was killed in Iraq.

65.     Plaintiff Jane Doe 8 is a citizen of the United States and domiciled in the State of New York. She is the step-mother of John Doe 16.

66. Plaintiff John Doe 8 is a citizen of the United States and domiciled in the State of New York. He is the father of John Doe 16.

67. Plaintiff Jane Doe 9 is a citizen of the United States and domiciled in the State of New York. She is the sister of John Doe 16.

68. Plaintiff John Doe 9 is a citizen of the United States and domiciled in the State of New York. He is the brother of John Doe 16.

69. Plaintiff John Doe 10 is a citizen of the United States and domiciled in the State of North Carolina. He is the brother of John Doe 16.

70. Plaintiff John Doe 11 is a citizen of the United States and domiciled in the State of New York. He is the brother of John Doe 16.

71. Plaintiff John Doe 12 is a citizen of the United States and domiciled in the State of New York. He is the step-brother of John Doe 16.

72. Plaintiff Jane Doe 10 is a citizen of the United States and domiciled in the State of California. She is the step-sister of John Doe 16.

73. Plaintiff John Doe 13 is a citizen of the United States and domiciled in the State of New York. He is the step-brother of John Doe 16.

74. Plaintiff John Doe 14 is a citizen of the United States and domiciled in the State of New York. He is the step-brother of John Doe 16.

75. Plaintiff John Doe 15 is a citizen of the United States and domiciled in the State of Alaska. He is the step-brother of John Doe 16.

76. Plaintiff John Doe 8 brings an action individually and on behalf of the Estate of John Doe 16, as its legal representative.

77. As a result of the attack, and the death of John Doe 16, Plaintiffs Jane Doe 8, John

Doe 8, Jane Doe 9, John Doe 9, John Doe 10, John Doe 11, John Doe 12, Jane Doe 10, John Doe 13, John Doe 14, and John Doe 15 have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**Doe Family 5**

78.     John Doe 19 was a citizen of the United States and domiciled in the State of Nebraska when he was killed in Iraq.

79.     Plaintiff Jane Doe 11 is a citizen of the United States and domiciled in the State of Nebraska. She is the mother of John Doe 19.

80.     John Doe 20 was a citizen of the United States at the time of John Doe 19's death. He was the father of John Doe 19. John Doe 20 died on June 11, 2011.

81.     Plaintiff John Doe 17 is a citizen of the United States and domiciled in the State of Kansas. He is the brother of John Doe 19.

82.     Plaintiff John Doe 18 is a citizen of the United States and domiciled in the State of Nebraska. He is the brother of John Doe 19.

83.     Plaintiff Jane Doe 11 brings an action individually and on behalf of the Estate of John Doe 19, as its legal representative.

84.     Plaintiff Jane Doe 11 brings an action individually and on behalf of the Estate of John Doe 20, as its legal representative.

85.     As a result of the attack, and the death of John Doe 19, Plaintiffs Jane Doe 11, John Doe 17, and John Doe 18 have experienced severe mental anguish, extreme emotional pain and suffering, and loss of their son's/brother's society, companionship, comfort, advice and counsel.

**Doe Family 6**

86.     Plaintiff John Doe 21 is a citizen of the United States and domiciled in the State of North Carolina.

87.     John Doe 21 was wounded while helping to defend the PJCC's main building.

88.     He sustained serious shrapnel injuries when a grenade exploded in the doorway of the room that he was defending.

89.     John Doe 21 also suffered hearing loss and tinnitus.

90.     He suffers from Post-Traumatic Stress Disorder ("PTSD") for which he has received ongoing treatment.

91.     As a result of the attack, and the injuries he suffered, John Doe 21 has experienced severe physical and mental anguish and extreme emotional pain and suffering.

92.     Plaintiff Jane Doe 12 is a citizen of the United States and domiciled in the State of North Carolina. She is the wife of John Doe 21.

93.     Plaintiff John Doe 22 is a citizen of the United States and domiciled in the State of North Carolina. He is the son of John Doe 21.

94.     Plaintiff John Doe 23, a minor represented by his legal guardians John Doe 21 and Jane Doe 12, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of John Doe 21.

95.     Plaintiff John Doe 24, a minor represented by his legal guardians John Doe 21 and Jane Doe 12, is a citizen of the United States and domiciled in the State of North Carolina. He is the son of John Doe 21.

96.     As a result of the attack, and the injuries John Doe 21 suffered, Plaintiffs Jane Doe 12, John Doe 22, John Doe 23, and John Doe 24 have experienced severe mental anguish and extreme emotional pain and suffering.

**Doe Family 7**

97.     Plaintiff John Doe 25 is a citizen of the United States and domiciled in the State of Ohio.

98.     John Doe 25 was wounded while helping to defend the PJCC's main building.

99.     As a result of an explosion that occurred during the attack, John Doe 25 was thrown high into the air and sustained injuries to his back and spine.

100.    The aforementioned injuries have caused him great pain.

101.    As a result of the attack, and the injuries he suffered, John Doe 25 has experienced severe physical and mental anguish and extreme emotional pain and suffering.

**Doe Family 8**

102.    Plaintiff John Doe 26 is a citizen of the United States and domiciled in the State of Washington.

103.    John Doe 26 was wounded while helping to defend the PJCC's main building.

104.    He was in the same room as John Doe 2 when the grenade detonated that killed John Doe 2.

105.    In addition to witnessing John Doe 2's murder, John Doe 26 also observed other soldiers being killed and injured.

106.    John Doe 26 attempted to assist the aforementioned soldiers.

107.    His clothing was covered in blood, causing him great distress, as he was initially unable to determine if the blood was his own or belonged to one of the surrounding soldiers.

108.    These images and memories of what he witnessed throughout the attack have caused him great distress.

109.    He has experienced sleep-related problems and headaches following the attack.

110.    As a result of the attack, and the injuries he suffered, John Doe 26 has experienced severe mental anguish and extreme emotional pain and suffering.

**Doe Family 9**

111.    Plaintiff John Doe 27 is a citizen of the United States and domiciled in the State of Michigan.

112.    John Doe 27 was in the PJCC's adjacent building when the attack occurred.

113.    He has experienced survivor's guilt following the attack.

114.    John Doe 27 has been prescribed medication to address issues of depression and anxiety.

115.    As a result of the attack, and the injuries he suffered, John Doe 27 has experienced severe mental anguish and extreme emotional pain and suffering.

116.    Plaintiff Jane Doe 13 is a citizen of the United States and domiciled in the State of Michigan. She is the wife of John Doe 27.

117.    Plaintiff John Doe 28, a minor represented by his legal guardian Jane Doe 13, is a citizen of the United States and domiciled in the State of Michigan. He is the son of Jane Doe 13 and the step-son of John Doe 27.

118.    Plaintiff Jane Doe 14, a minor represented by her legal guardians John Doe 27 and Jane Doe 13, is a citizen of the United States and domiciled in the State of Michigan. She is the daughter of John Doe 27 and Jane Doe 13.

119.    Plaintiff John Doe 29, a minor represented by his legal guardians, John Doe 27 and Jane Doe 13, is a citizen of the United States and domiciled in the State of Michigan. He is the son of John Doe 27 and Jane Doe 13.

120.     Plaintiff Jane Doe 15, a minor represented by her legal guardians, John Doe 27 and Jane Doe 13, is a citizen of the United States and domiciled in the State of Michigan. She is the daughter of John Doe 27 and Jane Doe 13.

121.     As a result of the attack and the injuries John Doe 27 suffered, Plaintiffs Jane Doe 13, John Doe 28, Jane Doe 14, John Doe 29, and Jane Doe 15 have experienced severe mental anguish and extreme emotional pain and suffering.

## THE DEFENDANT

### A.     HEZBOLLAH'S DESIGNATIONS

122.     Hezbollah (a/k/a Hizbullah) is a terrorist organization based in Lebanon.

123.     Hezbollah was designated a Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the AEDPA) on October 8, 1997 by publication in the Federal Register (62 F.R. 52650). This designation was recertified every two years through 2004, when recertification as an FTO was no longer required pursuant to the Intelligence Reform and Terrorism Prevention Act of 2004.

124.     Hezbollah was designated a Specially Designated Terrorist ("SDT") pursuant to Executive Order ("E.O.") 12947 on January 23, 1995. In the designation, President Clinton stated, "the grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

125.     Hezbollah was designated a Specially Designated Global Terrorist ("SDGT") pursuant to E.O. 13224 on October 31, 2001.

### B.     HEZBOLLAH'S LEADERSHIP

126.    Sheikh Subhi al-Tufayli and Abbas al-Musawi helped establish Hezbollah in 1982. Al-Tufayli was Hezbollah's first Secretary General, from 1989 until 1991.

127.    In 1992, after Al-Musawi's death, Sheikh Sayyed Hassan Nasrallah became Hezbollah's leader and Secretary General.

128.    At all relevant times, Nasrallah has remained in that position. He has repeatedly publicly proclaimed his willingness to employ terrorist tactics.

C.    **HEZBOLLAH'S NETWORK**

129.    After its founding, Hezbollah evolved into a multifaceted, sophisticated, highly organized, politically powerful, and well-financed terrorist organization.

130.    Hezbollah now resembles a multinational corporate or governmental entity, with departments, agencies, branches, in-house banking, insurance, and other financial services, and media outreach. Its estimated enterprise value is worth billions of U.S. dollars.

131.    Hezbollah's network consists of a multitude of departments that assist its leadership in carrying out its mission, and include, but are not limited to, entities that are tasked with: (1) terrorist and paramilitary activities; (2) social services and "charitable" activities; (3) general fundraising; (4) construction and infrastructure; (5) financial and insurance services; and (6) media services.

1.    **The Islamic Resistance Support Organization ("IRSO")**

132.    The Islamic Resistance Support Organization ("IRSO") (a/k/a: Hayat al-Dam Lil-Muqawama al-Islamiya) is a key Hezbollah fundraising organization.

133.    IRSO was established in the mid-1980s. Its executive branches were established as part of Hezbollah's regional committees in Beirut, the Bakka valley and al-Jabel.

134. IRSO was designated an SDGT pursuant to Executive Order 13224 on August 29, 2006.

### 2. The Martyrs Foundation: Part of Hezbollah's General Fundraising Department

135. Al-Mua'assat al-Shahid, also known as Boniad-e Shahid, Bonyad Shahid, The Martyrs Foundation Charitable Social Society, Al-Shahid Social Association, and Ashaheed Foundation (hereafter "the Martyrs Foundation"), is one of Hezbollah's core organizations.

136. The Martyrs Foundation was established in Lebanon in 1982 and provides death benefits to the families of deceased terrorists through a sponsorship program. Sponsors may choose to support one or more people depending upon the size of the donation, and the Martyrs Foundation opens up a bank account in the recipient's name(s).

137. The Martyrs Foundation was established to guarantee stipends for the families of Hezbollah fighters who die in battle. It also purports to open bank accounts for the "martyrs'" children.

138. Martyrs Foundation officials have close ties to Hezbollah's leadership and other charitable fronts within the Hezbollah network. For example, Qasem Aliq, a United States designated terrorist and Hezbollah official, is the former director of the Martyrs Foundation and current director of Jihad al-Bina (part of the Construction Department as discussed below).

139. On July 24, 2007, the U.S. Treasury Department designated the Martyrs Foundation a Specially Designated Global Terrorist.

140. According to the Treasury Department designation:

> The Martyrs Foundation is an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant, including Hezbollah [sic] … To this end, the Martyrs Foundation established branches in Lebanon staffed by leaders and members of these same terrorist groups. The Martyrs Foundation branches in Lebanon has

also provided financial support to the families of killed or imprisoned Hezbollah [sic] … In addition to fundraising responsibilities, senior Martyrs Foundation officials were directly involved in Hezbollah [sic] operations against Israel during the July-August 2006 conflict.

141.    In 2011, the U.S. Treasury Department identified the Lebanese Canadian Bank SAL ("LCB") as a financial institution of primary money laundering concern.

142.    Hezbollah transferred substantial sums of money through LCB's New York correspondent account(s) for the benefit of the Martyrs Foundation.

### 3.    Other Agents and Instrumentalities of Hezbollah

143.    In addition to the foregoing, the following entities have been identified as agents and/or instrumentalities of Hezbollah:

   a. **Yousser Company for Finance and Investment** – designated on September 7, 2006 by the U.S. Treasury Department as a Specially Designated Global Terrorist.

   b. **Al-Mabarrat Charitable Society** – established by Hezbollah's spiritual leader Sheikh Muhammad Husein Fadlallah.

   c. **Al-Manar TV** (a/k/a Lebanese Communication Group, LCG S.A.L.) – designated on March 23, 2006 by the U.S. Treasury Department as a Specially Designated Global Terrorist.

   d. **Jihad al-Bina'a** (a/k/a Waad Project) – designated on February 20, 2007 by the U.S. Treasury Department as a Specially Designated Global Terrorist.

   e. **Iranian Committee for the Reconstruction of Lebanon ("ICRL")** – designated on August 3, 2010 by the U.S. Treasury Department as a Specially Designated Global Terrorist.

   f. **Imam Khomeini Relief Committee ("IKRC")** – Lebanon Branch designated on August 3, 2010 by the U.S. Treasury Department as a Specially Designated Global Terrorist.

144.    These and other agents and/or instrumentalities of Hezbollah have raised and collected funds through the international financial system, including through U.S. financial institutions.

**FIRST CLAIM FOR RELIEF**
**(Acts of International Terrorism in Violation of 18 U.S.C. §2333(a))**

145.     Plaintiffs incorporate the preceding allegations as if fully set forth herein.

146.     Defendant's acts in killing, and attempting to kill, U.S. nationals and other persons, were, are and appear to be intended to: (a) intimidate or coerce the civilian populations of the United States and Iraq, (b) influence the policy of the U.S. government by intimidation or coercion and (c) affect the conduct of the U.S. government by mass destruction and murder within the meaning of 18 U.S.C. § 2331.

147.     Defendant's acts were dangerous to human life, by their nature and as evidenced by their consequences.

148.     Defendant's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

149.     Accordingly, Defendant's acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333(a).

150.     The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

151.     For the reasons set forth above, Defendant is therefore civilly liable for damages to Plaintiffs for injuries to their person, property or business by reason of acts of international terrorism pursuant to 18 U.S.C. § 2333(a).

**SECOND CLAIM FOR RELIEF**
**(Murder, Attempted Murder and Serious Bodily Injuries to United States Citizens in Violation of 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b) and 18 U.S.C. § 2333(a))**

152.    Plaintiffs incorporate the preceding allegations as if fully set forth herein.

153.    Each of the Plaintiffs has been injured in his person by reason of acts committed by Hezbollah that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

154.    Defendant's acts in killing, and attempting to kill, U.S. nationals and other persons, were, are and appear to be intended to: (a) intimidate or coerce the civilian populations of the United States and Iraq, (b) influence the policy of the U.S. government by intimidation or coercion and (c) affect the conduct of the U.S. government by mass destruction and murder within the meaning of 18 U.S.C. § 2331.

155.    The acts of terrorism committed by Hezbollah set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

156.    By carrying out violations of 18 U.S.C. § 2332 that have caused each of the Plaintiffs to be injured in his or her person, Hezbollah is civilly liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiffs have sustained as a result of such injuries.

## THIRD CLAIM FOR RELIEF
### (Committing Acts of International Terrorism in Violation of 18 U.S.C. §§ 2333(a) and 2339A)

157.    Plaintiffs incorporate the preceding allegations as if fully set forth herein.

158.    Defendant Hezbollah provided material support to AAH and violated 18 U.S.C. § 2339A by conspiring with and providing material support and resources to AAH knowing or

21

intending that they be used in preparation for or in carrying out the Karbala attack that constituted a violation of section 18 U.S.C. § 2332, and assisted in the preparation for, carrying out, and commission of acts of international terrorism described herein.

159.     Defendant's acts in killing, and attempting to kill, U.S. nationals and other persons, were, are and appear to be intended to: (a) intimidate or coerce the civilian populations of the United States and Iraq, (b) influence the policy of the U.S. government by intimidation or coercion and (c) affect the conduct of the U.S. government by mass destruction and murder within the meaning of 18 U.S.C. § 2331.

160.     Defendant Hezbollah's conduct was a substantial cause in fact and a significant, foreseeable factor in the chain of events leading to the Plaintiffs' injuries.

161.     Defendant's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

162.     Hezbollah's knowing provision of material support to AAH involved acts that were dangerous to human life, by their nature and as evidenced by their consequences.

163.     Furthermore, each Plaintiff's injuries constitute a harm falling within the risk contemplated by Hezbollah's material support to AAH.

164.     The acts of terrorism committed by Hezbollah set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

165.    Through its conduct as described above, by knowingly providing material support to AAH and thereby violating 18 U.S.C. § 2339A in the manner and with the state of mind alleged above, Hezbollah is civilly liable for damages to each Plaintiff for their injuries pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief against Defendant:

1.    For judgment against Defendant and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

2.    For judgment against Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a);

3.    For judgment against Defendant and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

4.    For an Order declaring that Defendant has violated the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq*.; and

5.    For such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated this 31st day of May, 2017

DEWSNUP, KING OLSEN WOREL HAVAS MORTENSEN


_____
David R. Olsen
Charles T. Contrad
