DEWSNUP, KING & OLSEN
36 S. State Street, Ste. 2400
Salt Lake City, UT 84111
Phone: (801) 533-0400
Fax: (801) 363-4218

*Attorneys for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION**

---

| | | |
|---|---|---|
| JANE DOE 1, JOHN DOE 1, JANE DOE 1 FOR THE ESTATE OF JOHN DOE 2, JANE DOE 2, JANE DOE 3, JOHN DOE 3, JOHN DOE 4, JANE DOE 4, JANE DOE 2 FOR THE ESTATE OF JOHN DOE 5, JOHN DOE 6, JANE DOE 5, JANE DOE 6, JANE DOE 7, JANE DOE 5 FOR THE ESTATE OF JOHN DOE 7, JANE DOE 8, JOHN DOE 8, JANE DOE 9, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, JANE DOE 10, JOHN DOE 13, JOHN DOE 14, JOHN DOE 15, JOHN DOE 8 FOR THE ESTATE OF JOHN DOE 16, JANE DOE 11, JOHN DOE 17, JOHN DOE 18, JANE DOE 11 FOR THE ESTATE OF JOHN DOE 19, JANE DOE 11 FOR THE ESTATE OF JOHN DOE 20, JOHN DOE 21, JANE DOE 12, JOHN DOE 22, JOHN DOE 23, JOHN DOE 24, JOHN DOE 25, JOHN DOE 26, JOHN DOE 27, JANE DOE 13, JOHN DOE 28, JANE DOE 14, JOHN DOE 29 and JANE DOE 15, | : : : : : : : : : : : : : : : : : : : : : : : : | **MOTION FOR EVIDENTIARY HEARING AND ENTRY OF DEFAULT JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>Case No. 2:16-cv-00910<br><br>Judge: David Nuffer<br><br>Oral Argument Requested |
| Plaintiffs, | : : : | |
| v. | : : | |
| HEZBOLLAH, | : : : | |
| Defendant. | : | |

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

REQUESTED RELIEF AND GROUNDS THEREFOR .............................................. 1

STATEMENT OF ANTICIPATED FACTS ................................................................. 1

I.     The Terrorist Attack on the Karbala Provincial Joint Coordination Center ...................... 1

II.    Attribution for the Attack............................................................................................ 4

III.   Plaintiffs' Injuries ..................................................................................................... 6

IV.   Plaintiffs' Anticipated Evidence ................................................................................ 7

JURISDICTION AND ELEMENTS ........................................................................... 8

I.     Jurisdiction Over Plaintiffs' Claims and Hezbollah ................................................ 8

   A.    Subject Matter Jurisdiction.................................................................................... 8

      1.    The Attack Did Not Occur During a Declared War or an Armed
             Conflict Between Nations .............................................................................. 9

      2.    The Attack Did Not Occur During an Armed Conflict Between
             "Military Forces." ....................................................................................... 10

   B.    Personal Jurisdiction and Venue ...................................................................... 13

II.    Elements of Plaintiffs' Claims ................................................................................ 15

   A.    The Attack Was an Unlawful Action. ............................................................... 16

   B.    Hezbollah Acted with the Requisite Mental State for Each of Plaintiffs' Claims ........ 18

   C.    Hezbollah's Actions Proximately Caused Plaintiffs' Injuries....................................... 19

   D.    Nationality and Injury ...................................................................................... 20

      1.    Each of the Plaintiffs Is a National of the United States ............................. 20

      2.    Each of the Plaintiffs Was Injured in His or Her Person ........................... 21

CONCLUSION.......................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Abecassis v. Wyatt*
   785 F. Supp. 2d 614 (S.D. Tex. 2011) ....................................................................... 19

*Boim v. Holy Land Foundation for Relief & Development* ("*Boim III*")
   549 F.3d 685 (7th Cir. 2008) (en banc) ....................................................... 16, 17, 18

*Estate of Klieman v. Palestinian Authority*,
   424 F. Supp. 2d 153 (D.D.C. 2006) ............................................................................ 9

*Estates of Ungar ex rel. Strachman v. Palestinian Authority*
   304 F. Supp. 2d 232 (D.R.I. 2004) ........................................................................... 21

*Gill v. Arab Bank, PLC* ("*Gill I*")
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) .................................................... 9, 11, 12, 18

*Gill v. Arab Bank, PLC* ("*Gill II*")
   893 F. Supp. 2d 542 (E.D.N.Y. 2012) ................................................................ 15, 16

*Goldberg v. UBS AG*
   660 F. Supp. 2d 410 (E.D.N.Y. 2009) ..................................................................... 19

*Holder v. Humanitarian Law Project*
   561 U.S. 1 (2010).......................................................................................................... 15

*Kaplan v. Central Bank of Islamic Republic of Iran*
   961 F. Supp. 2d 185 (D.D.C. 2013)............................................................................. 9

*Lelchook v. Commerzbank AG*
   No. 10 CIV. 5795, 2011 WL 4087448 (S.D.N.Y. Aug. 2, 2011) ........................... 21

*Linde v. Arab Bank, PLC*
   97 F. Supp. 3d 287 (E.D.N.Y. 2015) .......................................................... 16, 17, 19

*Morris v. Khadr*
   415 F. Supp. 2d 1323 (D. Utah 2006).............................................................. passim

*Mwani v. bin Laden*
   417 F.3d 1 (D.C. Cir. 2005).................................................................................... 14

*Owens v. Republic of Sudan*
   No. 14-5105, 2017 WL 3203263 (D.C. Cir. July 28, 2017).................................. 20

*Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*
   505 F.2d 989 (2d Cir. 1974) ...................................................................................... 12

*Sokolow v. Palestine Liberation Organization*
583 F. Supp. 2d 451 (S.D.N.Y. 2008) ..................................................... 9

*United States v. Hammoud*
381 F.3d 316 (4th Cir. 2004) .................................................................. 15

*United States v. Lebanese Canadian Bank SAL*
No. 11 Civ. 9186 (PAE) (S.D.N.Y. 2011) ............................................. 15

*United States v. Lindh*
212 F. Supp. 2d 541 (E.D. Va. 2002) ..................................................... 11

*United States v. Robertson*
473 F.3d 1289 (10th Cir. 2007) .............................................................. 19

*United States v. Serawop*
410 F.3d 656 (10th Cir. 2005) ................................................................ 19

*Waldman v. Palestine Liberation Organization*
835 F.3d 317 (2d Cir. 2016) ................................................................... 14

*Weiss v. Arab Bank, PLC*
No. 06 CV 1623 (NG)(VVP), 2007 WL 4565060 (E.D.N.Y. Dec. 21, 2007) ........................ 11

*Weiss v. National Westminster Bank PLC*
768 F.3d 202 (2d Cir. 2014) ................................................................... 17

**Statutes**

8 U.S.C. § 1101 ......................................................................................... 20

8 U.S.C. § 1189 ........................................................................................... 4

18 U.S.C. § 1111 ................................................................................. 17, 19

18 U.S.C. § 1112 ................................................................................. 17, 19

18 U.S.C. § 2331 ................................................................... 9, 15, 16, 20

18 U.S.C. § 2332 ................................................................................. 17, 19

18 U.S.C. § 2333 ................................................................................ *passim*

18 U.S.C. § 2334 ......................................................................................... 15

18 U.S.C. § 2336 ........................................................................................... 9

18 U.S.C. § 2339 ................................................................................. 17, 18

28 U.S.C. § 1331 ........................................................................................................ 8

**Other Authorities**

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 (Geneva III),
  art. 4(A)(2) ........................................................................................................ 11

H. Rep. 102-1040 (1992) .................................................................................... 10, 11

Protocol Additional to the Geneva Convention of Aug. 12, 1949, and Relating to the Protection
  of Victims of International Armed Conflicts, June 8, 1977 (Protocol I), art. 44(3) ................ 11

Resolution of 2002, Pub. L. No. 107-243
  116 Stat. 1498 (Oct. 16, 2002) .......................................................................... 9

S. Rep. 102-342 (1992) ........................................................................................ 10

United Nations Security Council Resolution 1511
  U.N. Doc. S/RES/1511 (Oct. 16, 2003) .......................................................... 10

United Nations Security Council Resolution 1546
  U.N. Doc. S/RES/1546 (June 7, 2004) ........................................................... 10

**Rules**

Fed. R. Civ. P. 4(k)(2) ........................................................................................ 13

Fed. R. Civ. P. 55 ................................................................................................ 1

## REQUESTED RELIEF AND GROUNDS THEREFOR

Plaintiffs respectfully move this Court to conduct an evidentiary hearing pursuant to Federal Rule of Civil Procedure 55(b)(2)(B) and (C) and thereafter enter a default judgment against defendant Hezbollah. Plaintiffs are entitled to entry of default judgment because they properly served defendant, Hezbollah failed to plead or otherwise defend, the clerk entered default pursuant to Fed. R. Civ. P. 55(a), and Plaintiffs will show at the proposed evidentiary hearing that their evidence supports their allegations and establishes the amount of their damages.

## MEMORANDUM IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING AND DEFAULT JUDGMENT

Plaintiffs submit this brief (1) summarizing the facts they intend to establish by presenting documentary evidence and fact witness and expert testimony, (2) setting out in detail the Court's subject matter jurisdiction over the matter and personal jurisdiction over Hezbollah, and (3) outlining the elements of each of their claims and the legal and factual support they will provide to satisfy each of those elements.

## STATEMENT OF ANTICIPATED FACTS

### I. The Terrorist Attack on the Karbala Provincial Joint Coordination Center

On the night of January 20, 2007, terrorists launched a coordinated attack (the "Attack") against the Provincial Joint Coordination Center ("PJCC") in Karbala, Iraq, a shared U.S.-Iraqi military and governmental headquarters.[1] At approximately 6:00 p.m., between seven and nine American model SUVs approached the PJCC's southern checkpoint, which was manned by Iraqi police. The SUVs' occupants spoke in English and wore U.S. army-style uniforms and gear. At

---

[1]     The PJCC served as regional headquarters for the Karbala provincial government, Iraqi police, and U.S. military and governmental staff. The mission of the U.S. "Karbala Provincial Team," which worked and resided at the PJCC, was to assist and develop Iraqi governmental institutions by providing security, aid, and advice to the provincial government, and by providing instruction and training to the Iraqi Police.

each checkpoint, the occupants, presenting themselves as U.S. security contractors, directed (or forced) the Iraqi police to surrender their weapons. Three SUVs remained near the checkpoints while the remaining SUVs proceeded north toward the PJCC parking lot.

After pulling into the lot, five terrorists dismounted from the lead SUV and walked directly into the PJCC compound, where they encountered John Doe 16 and John Doe 7, who were manning the High Mobility Multipurpose Wheeled Vehicle ("HMMWV" or "Humvee") outside the PJCC's west entrance. The terrorists greeted John Doe 16 and John Doe 7 in English. An Iraqi policeman who witnessed the event stated that John Doe 16 approached the SUVs, apparently unaware that anything was out of the ordinary. The terrorists walked past the soldiers; then one turned and shot John Doe 16 from behind. Another terrorist immediately climbed onto the back of the Humvee and shot John Doe 7. Later during the Attack, these soldiers—injured but alive—were loaded into two of the terrorists' SUVs.

Seconds after the shootings, the terrorists continued the precisely coordinated Attack within and behind the PJCC's main building and barracks area. First, a terrorist attempted to force his way into the Command and Control room—the "Commo room" was the PJCC's virtual "nerve center" and was vital to its ability to respond to an attack. The terrorist opened the door and fired into the Commo room with his AK-47. The U.S. soldier closest to the door slammed it shut before the terrorist could step inside the Commo room, but the door closed on the AK-47's muzzle—with the door ajar, the attacking terrorist tossed a grenade into the room. John Doe 2 followed the grenade as it bounced across the Commo room floor and fell on it. The other soldiers in the Commo room unanimously reported to the Army investigator that John Doe 2's action provided them time to continue resisting the terrorist's attempts to overrun this critical part of the PJCC. At some point,

John Doe 2 was shot and died on the floor of the Commo room before his fellow soldiers could provide him with first aid.

After John Doe 2 fell on the grenade, the defending soldiers reported hearing small arms-fire in the hallway, accompanied by a grenade explosion. That grenade detonated in a nearby officers' room, likely occupied at that time by John Doe 5 and John Doe 19. Shortly thereafter, terrorists abducted John Doe 5 and John Doe 19 from the PJCC main building. Both likely resisted capture but were overcome by their attackers—a witness stated that John Doe 19 had serious injuries when he was led out of the PJCC. Outside, the terrorists loaded John Doe 5 and John Doe 19 into SUVs, along with John Doe 7 and John Doe 16. Army investigators concluded that John Doe 7 and John Doe 16 were alive at this point, despite their gunshot wounds, because the terrorists handcuffed them at some point during the terrorists' escape.

After successfully removing John Doe 5 and John Doe 19 from the main building, one of the terrorists threw a powerful grenade into the hallway near the Commo room and the officers' room. The resulting explosion left a hole in the concrete floor and blew the doors in the hallway off of their hinges, injuring John Doe 21. The terrorists increased their rate of fire, pinning down the soldiers trapped in the Commo room. Simultaneously, terrorists destroyed two Humvees positioned in the courtyard, utilizing some form of explosive devices. The explosions destroying the Humvees knocked some soldiers in the barracks onto their backs, injuring John Doe 25. Other soldiers, including John Doe 26 and John Doe 27, attempted to engage the terrorists as they fled with their hostages. The entire Attack up to this point lasted only minutes.

Under covering fire and smoke grenades, the terrorists escaped the PJCC and headed east at a high rate of speed. At 7:30 p.m., five of the SUVs passed through an Iraqi Army checkpoint north of Mahawil without stopping, and the Iraqi Army division stationed nearby and the Mahawil

police gave chase. The terrorists, apparently aware of the disruption of their escape plan, moved their convoy onto a back road, changed out of their American uniforms, abandoned most of their equipment, and shot the handcuffed hostages. An Iraqi Army "Quick Reaction Force" found John Doe 7 and John Doe 16 in the back of one of the SUVs, handcuffed, body armor open, and shot dead. John Doe 19 was found shot dead on the ground, near the abandoned vehicles. The Quick Reaction Force initially found John Doe 5—shot in the head but alive—among the abandoned SUVs. Arriving American forces attempted to get the critically injured officer to a hospital, but John Doe 5 died en route.

## II.    Attribution for the Attack

Coalition Forces concluded that the Attack was a joint operation between Hezbollah and the Iraqi-Shi'a terrorist group Asa'ib Ahl al-Haq ("AAH"). AAH (also known as the Khazali network for its founder, Qais Khazali) is an Iranian-backed terrorist group which at that time targeted American forces in Iraq. Iran supports AAH through the "Qods Force" wing of Iran's paramilitary Islamic Revolutionary Guard Corps ("IRGC"). Qods Force ("IRGC-QF") is responsible for the IRGC's terrorist activities outside of Iran and is an integral component of Iran's terrorist infrastructure, as well as a U.S-designated Specially Designated Global Terrorist ("SDGT").[2] Iran also supported AAH through Iran's proxy for global terrorist operations, the U.S.-designated Foreign Terrorist Organization ("FTO") Hezbollah.[3]

Coalition Forces investigating the Attack attributed much of its planning to a senior Hezbollah operative and commander, Ali Musa Daqduq. In 2005, senior Hezbollah leadership

---

[2]    The U.S. Treasury designated IRGC-QF pursuant to Executive Order 13224 on October 25, 2007, following an investigation by the Treasury's Office of Foreign Assets Control ("OFAC"). OFAC found, *inter alia*, that IRGC-QF provides training and $100 to $200 million in funding a year to Hezbollah and "provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." *See* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

[3]    Hezbollah was designated an FTO by the Secretary of State on October 8, 1997, pursuant to 8 U.S.C. § 1189.

directed Daqduq to go to Iran and work under the IRGC-QF's direction in training Iraqi terrorists. At the IRGC-QF's direction, Daqduq made trips in and out of Iraq and managed the training and arming of Iraqi Shi'a terrorists, including in the use of mortars, rockets, improvised explosive devices ("IEDs") and kidnapping operations.

On November 19, 2012, the United States Treasury Department designated Daqduq an SDGT for acting as "a senior Hizballah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers." The Treasury Department further found:

> Hizballah's terrorist activities stretch beyond the borders of Lebanon. These terrorist acts are in some cases funded, coordinated, and carried out in concert with the Iranian Revolutionary Guard Corps-Qods Force (IRGC-QF). Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks against Coalition and Iraqi forces.[4]

It also explained that, in 2006, "Daqduq had been ordered by Hizballah to work with IRGC-QF to provide training and equipment to [Shi'a Iraqi terrorists] to augment their ability to inflict damage against U.S. troops."

On March 20, 2007, Coalition Forces in southern Iraq captured Daqduq. Daqduq was found carrying a 22-page memorandum which "detailed the planning, preparation, approval process and conduct of the [Karbala] operation." Qais Khazali, along with his brother, Laith, were also captured. According to Coalition spokesman Brig. Gen. Kevin Bergner, documents captured with Qais al-Khazali showed that the IRGC-QF had gathered detailed information on U.S. "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers" by Hezbollah and Daqduq. The Attack, particularly the tactical decision to target the

---

[4]    *See* https://www.treasury.gov/press-center/press-releases/Pages/tg1775.aspx.

Commo room, also demonstrated that the attackers had detailed intelligence concerning the PJCC's layout and command and control systems. The Army's subsequent investigation noted that the Attack's scale was "well beyond the caliber associated with local terrorist or militia capabilities."

## III.     Plaintiffs' Injuries

At a minimum, Plaintiffs suffered the following injuries:

John Doe 2 fell on what was likely a concussion or stun grenade and survived the blast, but was shot by a terrorist with an automatic assault rifle a short time thereafter. He died of his gunshot wounds. Before succumbing, he likely suffered extreme physical anguish and emotional distress.

John Doe 5 was kidnapped and handcuffed, and as a result experienced fear of imminent death for approximately an hour. He was then shot in the head, and died en route to the hospital.

John Doe 7 was shot at close range by an automatic assault rifle and likely survived the injury. He was then handcuffed and taken hostage, experiencing fear of imminent death and extreme physical pain from his gunshot injury. Approximately an hour after his abduction, he was shot again and died as a result. His preliminary autopsy report also shows numerous blunt force injuries on his body and limbs.

John Doe 16 was shot in the neck at close range by an automatic assault rifle, and likely survived the injury. He was then handcuffed and taken hostage, during which period he experienced fear of imminent death and extreme physical pain from his gunshot injury. Approximately an hour after his abduction, he was shot again and died as a result. His preliminary autopsy report also shows abrasions and contusions on his body and limbs.

John Doe 19 was injured while resisting capture. He was then handcuffed and taken hostage, and experienced fear of imminent death for approximately an hour, before being shot

multiple times and dying from his wounds. His preliminary autopsy report shows significant injuries across his body in addition to his gunshot wounds.

John Doe 21 suffered shrapnel and other injuries when a grenade exploded in the room he was defending. As a result, he suffered hearing loss and tinnitus, and continues to suffer from Post-Traumatic Stress Disorder ("PTSD").

John Doe 25 was thrown into the air by an explosion, and sustained back and spinal injuries, which cause him great pain. He also suffers from severe mental anguish and extreme emotional pain and suffering.

John Doe 26 was in the Commo room while it was under attack by the terrorists, and witnessed the murder of John Doe 2, and his fellow soldiers being injured. He has experienced severe mental anguish and extreme emotional pain and suffering.

John Doe 27 was in a building adjacent to the main building, and attempted to engage the terrorists. As a result of his experiences during the Attack, he suffers severe mental anguish and extreme emotional pain and suffering.

John Does 1, 3, 4, 6, 8-15, 17, 18, and 20 and Jane Does 1-11 each suffered the loss of a loved one in the Attack, and suffer severe mental anguish and extreme emotional pain and suffering as a result.

John Does 22-24, 28, and 29 and Jane Does 12-15 have each witnessed the pain and suffering of a loved one injured in the Attack, and each suffer severe mental anguish and extreme emotional pain and suffering as a result.

## IV. Plaintiffs' Anticipated Evidence

Plaintiffs anticipate establishing the preceding facts with the following evidence:

- Expert testimony on the history and operations of Hezbollah, including its role as a terror proxy for Iran and supporter of Iranian-backed terrorist groups;

- Expert testimony on the history and operations of Iranian- and Hezbollah-backed terrorist groups in Iraq, including AAH;

- Expert testimony on psychological injuries, such as PTSD and the emotional suffering of family members of killed or injured victims of terrorism;

- Expert testimony on traumatic injuries associated with combat;

- Fact witness testimony concerning Plaintiffs' damages;

- Testimony of party-witnesses to the Attack; and

- Documentary and photographic evidence, including the results of the U.S. military's investigation into the Attack, materials seized by the U.S. military during arrests of some of the Attack's perpetrators, U.S. government reports and designations, and medical records and expert reports documenting Plaintiffs' injuries.

Plaintiffs estimate that presenting this evidence will require approximately three days of hearings.

## JURISDICTION AND ELEMENTS

### I.    Jurisdiction Over Plaintiffs' Claims and Hezbollah

### A.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States, and the Anti-Terrorism Act's civil cause of action, 18 U.S.C. § 2333(a), as a civil action brought by citizens of the United States and/or their estates, survivors, or heirs, who have been injured by reason of acts of international terrorism. When deciding whether plaintiffs have made a prima facie showing of subject matter jurisdiction, the court "must construe all relevant allegations in the light most favorable to the plaintiff."[5]

---

[5]    *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1332 (D. Utah 2006) (citing *Laguna Gatuna, Inc. v. Browner*, 58 F.3d 564, 565 (10th Cir. 1995)).

Section 2336(a) of the ATA states that: "no action shall be maintained under section 2333 of this title for injury or loss by reason of an act of war." 18 U.S.C. § 2331(4) defines an act of war as "any act occurring in the course of—

(A)     declared war;

(B)     armed conflict, whether or not war has been declared, between two or more nations; or

(C)     armed conflict between military forces of any origin[.]"

Although some courts have interpreted "act of war" as an affirmative defense, others have construed it as jurisdictional.[6] Without agreeing with the latter characterization, Plaintiffs show below that the Attack was not an act of war within the meaning of § 2336(a).

### 1.   The Attack Did Not Occur During a Declared War or an Armed Conflict Between Nations.

The Attack was an act of terrorism—not an act of war as defined by 18 U.S.C. § 2331(4). First, although Congress passed the Authorization for Use of Military Force ("AUMF") Against Iraq Resolution of 2002,[7] President Bush subsequently declared on May 1, 2003 that "major combat operations in Iraq have ended."[8] The Coalition Provisional Authority ("CPA") was

---

[6]     *Compare Stansell v. BGP, Inc.*, No. 09-cv-2501-T-30AEP, 2011 WL 1296881, at *10-11 (M.D. Fla. Mar. 31, 2011) (unpublished) (apparently rejecting act of war defense on Rule 12(b)(6) motion); *Weiss v. Arab Bank, PLC*, No. 06 CV 1623 NGVVP, 2007 WL 4565060, at *3 (E.D.N.Y. Dec. 21, 2007) (unpublished) (expressly declining to analyze the motion under Rule 12(b)(1), and treating act of war claim under Rule 12(b)(6); *Gill v. Arab Bank, PLC* ("*Gill I*"), 893 F. Supp. 2d 474, 508 (E.D.N.Y. 2012) ("defendant is incorrect insofar as it has argued that the act of war exception ... is jurisdictional. The exception merely provides ATA defendants with an affirmative defense.") (citation omitted); *Kaplan v. Cent. Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185, 199-200 (D.D.C. 2013) (declining to resolve whether the act of war defense is jurisdictional, an affirmative defense, or an element of the claim); *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451, 458 (S.D.N.Y. 2008) (declaring characterization of the legal nature of defendants' [act of war] objections irrelevant" because the alleged terrorist attacks were not acts of war) *with Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6-7 (D.D.C. 2005) (assuming, without discussion, that § 2336(a) is jurisdictional); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153 (D.D.C. 2006) (same); *Morris*, 415 F. Supp. 2d 1323 (same).

[7]     Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002).

[8]     *President Bush Announces Major Combat Operations in Iraq Have Ended* (May 1, 2003), available at http://georgewbush-whitehouse.archives.gov/news/releases/2003/05/20030501-15.html.

subsequently established as the interim government for Iraq on May 23, 2003, and the U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability."[9] The CPA then transferred sovereignty to Iraqi authorities on June 28, 2004, pursuant to a U.N. Security Council Resolution that expressly assigned the remaining Coalition Forces the task of helping Iraq "*by preventing and deterring terrorism.*"[10] In short, the armed conflict with *Iraq* ended well before the acts of terrorism at issue in this case, and the United States remained, first as an occupying authority and then as support for the Iraqi government, in substantial part to prevent and deter terrorism. Moreover, Congress never authorized the use of military force against – and the United States has never been in an "armed conflict" with – Iran or defendant Hezbollah.

### 2. The Attack Did Not Occur During an Armed Conflict Between "Military Forces."

Even *assuming* an armed conflict, the acts of international terrorism at issue here were not committed by "military forces" within the meaning of § 2336(a) of the ATA. Congress explained that "[t]he intention of this provision is to bar actions for injuries that result from military action by recognized governments *as opposed to terrorists*, even though governments also sometimes target civilian populations."[11] A government *may* conduct military action in an armed conflict not

---

[9]     S.C. Res. 1511, para. 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

[10]     S.C. Res. 1546, U.N. Doc. S/RES/1546 (June 7, 2004) ("*Decides* that the multinational force shall have the authority to take all necessary measures to contribute to the maintenance of security and stability in Iraq in accordance with the letters annexed to this resolution expressing, inter alia, the Iraqi request for the continued presence of the multinational force and setting out its tasks, *including by preventing and deterring terrorism* ...."). (Emphasis added.) The Security Council went on to condemn the kind of terrorist acts here at issue. *Id.* ¶ 10 ("*Condemns* all acts of terrorism in Iraq, *reaffirms* the obligations of Member States under [prior] resolutions ... , and other relevant international obligations with respect, inter alia, to terrorist activities in and from Iraq or against its citizens, and specifically *reiterates* its call upon Member States to prevent the transit of terrorists to and from Iraq, arms for terrorists, and financing that would support terrorists, and *re-emphasizes* the importance of strengthening the cooperation of the countries of the region, particularly neighbours of Iraq, in this regard ...."). *Id.* ¶ 17 (emphasis in original).

[11]     S. Rep. 102-342 at 46 (1992) (emphasis added). *See also* H. Rep. 102-1040, at 7 (1992).

just by its formal "armed forces," but also by "[m]embers of other militias and members of other volunteer groups, including those of organized resistance movements, belonging to a Party to the conflict and operating in and outside their own territory," *provided these kinds of military meet the same conditions as the armed forces of a state* – conditions that distinguish them from civilians and entitle them to combatant immunity.[12] In pertinent part, these conditions include:

    (a)    that of having a fixed distinctive sign recognizable at a distance;

    (b)    that of carrying arms openly; and

    (c)    that of conducting their operations in accordance with the laws and customs of war.[13]

In order to qualify as a "military force of any origin," for purposes of the act-of-war defense, a group would have to act like the armed forces of a nation by meeting the same conditions.[14] It is not enough that a force had something resembling military training, or functions as a military or paramilitary wing of a terrorist group.[15]

> Congress, in using that term ["military"], can be said to have designed the statute to contrast the traditional actions of national militaries with those of terrorist groups.... *[A] paramilitary or terrorist group or organization must act as a "military" traditionally (but not universally) does – i.e.*, in substantial conformance with the laws of war, with attacks directed at civilians making up an incidental

---

[12]    Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949 (Geneva III), art. 4(A)(2). Geneva III is a United States treaty and thus part of our domestic law, which Congress must be deemed to know when it enacted the defense, and with which the defense must be interpreted consistently. In fact, the legislative history of the act-of-war provision itself emphasizes that the defense applied only to injuries received in "*open*" armed conflict (and therefore not in surreptitious terrorist attacks) (H. Rep. 102-1040, at 7 (emphasis added)), an unmistakable reference to the basic condition that military forces carry their arms *openly*. *See also Gill I*, 893 F. Supp. 2d at 515.

[13]    Geneva III, art. 4A(2). *See also* Protocol Additional to the Geneva Convention of Aug. 12, 1949, and Relating to the Protection of Victims of International Armed Conflicts, June 8, 1977 (Protocol I), art. 44(3) (asserting that even a combatant who cannot distinguish himself must carry arms "openly" during engagements). "Nor are these … criteria unique to [Geneva III]; they are also established under customary international law . . ." followed by the United States. *United States v. Lindh*, 212 F. Supp. 2d 541, 557, nn.34-35 (E.D. Va. 2002) ("all armed forces or militias, regular and irregular, must meet the four criteria if their members are to receive combatant immunity").

[14]    *Gill I*, 893 F. Supp. 2d at 515.

[15]    *See Weiss v. Arab Bank, PLC*, No. 06 CV 1623 (NG)(VVP), 2007 WL 4565060, at *6 (E.D.N.Y. Dec. 21, 2007) (allegations that terrorists engage in military or paramilitary activities does not make them a "military force" within the meaning of the ATA); *Morris*, 415 F. Supp. 2d at 1333 (allegation that the group that conducted the terrorist attack received "military" training does not establish that the group operated as a military force).

rather than substantial portion of its activities – to have its challenged conduct qualify for protection pursuant to section 2331(4)(C).[16]

In fact, like Plaintiffs in this case, the plaintiff in *Morris* was a U.S. soldier attacked by a member of al Qaeda during combat in the armed conflict in Afghanistan after 9/11 (an armed conflict authorized by an AUMF expressly naming al Qaeda as the enemy), yet the court found that terrorist acts by organized groups like al Qaeda were not acts of war within the meaning of the ATA, noting that terrorists are defined as groups that systematically use violence "in order to intimidate a population or government into granting their demands."[17]

Hezbollah does not conduct itself as a military force within the meaning of the ATA nor did it do so in planning or directing the Attack. The only uniforms its agents used were stolen U.S. military uniforms,[18] in blatant violation of Protocol I, art. 37 (prohibiting perfidy). The injuries they inflicted were not the result of "open" armed conflict. They planned the murder of U.S. servicemen by subterfuge and further planned the kidnapping of U.S. servicemen that resulted in their summary executions, in violation of the fundamental law-of-war norm of Common Article 3(1)(a) of the Geneva Conventions against slaughtering soldiers who have been placed hors de combat by capture and detention.[19]

---

[16]   *Gill I*, 893 F. Supp. 2d at 515 (emphasis added).

[17]   415 F. Supp. 2d at 1333-34 (citation omitted).

[18]   *See* Compl. ¶ 17.

[19]   *See* Compl. ¶¶ 26-32. *See Pan American World Airways, Inc. v. Aetna Cas. & Surety Co., 505 F.2d 989, 1015 (2d Cir. 1974)* ("The loss of Pan American 747 [by a terrorist hijacking] was not caused by an act that is recognized as a warlike act. The hijackers did not wear insignia. They did not openly carry arms. Their acts had criminal rather than military overtones.").

## B. Personal Jurisdiction and Venue

Plaintiffs have alleged sufficient facts to establish this Court's personal jurisdiction over Hezbollah.[20] Hezbollah is subject to this Court's jurisdiction under Fed. R. Civ. P. 4(k)(2), which provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

As stated above, Plaintiffs' claims arise under the ATA, a federal law. Plaintiffs have served a summons on Hezbollah, as confirmed by this Court on June 7, 2017.[21] Hezbollah, a foreign unincorporated association, is likely not subject to the jurisdiction of any state court, nor has it contended otherwise.[22]

Specific personal jurisdiction in this Court is consistent with the Fifth Amendment's "minimum contacts" requirement because Hezbollah directed its acts at the United States. As this Court stated in *Morris*, "courts have held that the Due Process Clause's 'minimum contacts' requirement for personal jurisdiction is met when terrorists 'engage[] in unabashedly malignant

---

[20]    *See Morris*, 415 F. Supp. 2d at 1333-34 ("[A] prima facie showing is all that is required to establish personal jurisdiction in the default judgment setting.").

[21]    ECF No. 21.

[22]    "A defendant who wants to preclude the use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable). If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Morris*, 415 F. Supp. 2d at 1335 (quoting *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005)).

actions directed at [and] felt in' the forum."[23] For a federal claim, it is the United States as a whole that is the appropriate forum for measuring defendant's contacts.[24]

In *Mwani*, the D.C. Circuit credited "plaintiffs' allegations and evidence . . . that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States."[25] The district court had personal jurisdiction over bin Laden and al Qaeda because they "'purposefully directed [their] activities at residents' of the United States, and [] this litigation results from injuries to the plaintiffs 'that arise out of or relate to' those activities.'"[26] Because Hezbollah specifically and intentionally targeted U.S. nationals for murder and kidnapping at the PJCC, it directed its actions at the United States and should anticipate being haled into a U.S. court.

*Mwani* also noted that the Nairobi embassy attacks were part of "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders."[27] Likewise, Hezbollah has repeatedly targeted U.S. citizens—most notably the 1983 bombings of the Marine barracks and U.S. embassy in Beirut, Lebanon—and it has performed overt acts in support of that

---

[23] 415 F. Supp. 2d at 1333-34 (quoting *Mwani v. bin Laden*, 417 F.3d 1, 13). *See also Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 338 (2d Cir. 2016) (requiring that plaintiffs show that the "terrorist attacks were specifically targeted against United States citizens" and not simply that defendant had "the mere knowledge that United States citizens might be wronged in a foreign country" or that Americans were injured by "random and fortuitous" attacks).

[24] *Mwani*, 417 F.3d at 12 (holding that the District Court's "exclusive focus on contacts with the District of Columbia, rather than with the nation as a whole," was "incorrect").

[25] *Id.* at 13.

[26] *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). *See also Morris*, 415 F. Supp. at 1336 ("Because injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, terrorism inherently is the sort of 'conduct and connection with' the United States that should cause a foreign terrorist to 'reasonably anticipate being haled into court' here.") (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).

[27] 417 F.3d at 13.

conspiracy in the United States.[28] In *United States v. Lebanese Canadian Bank SAL*, No. 11 Civ. 9186 (PAE) (S.D.N.Y. 2011), the United States brought an in rem forfeiture action and civil money laundering complaint against multiple Lebanese financial institutions, as well as against various United States-based used car purchasers. The action arose out of an investigation by the U.S. Drug Enforcement Agency and other federal law enforcement agencies of a scheme to launder money through the U.S. financial system and the U.S. used car market for Hezbollah's benefit. Money is, of course, fungible.[29] Similarly, Hezbollah's illicit fundraising activities in the United States contributed to its overall capacity to commit acts of international terrorism, including the Attack.

Venue is proper in this district court pursuant to 18 U.S.C. § 2334(a) because Plaintiff Jane Doe 3 is resident in this district.

## II.     Elements of Plaintiffs' Claims

To prevail under the ATA, Plaintiffs must prove "three formal elements: unlawful action, the requisite mental state, and causation."[30] Section 2333 of the ATA also incorporates by reference the definition of international terrorism set forth in § 2331, which in turn incorporates by reference any federal or state criminal laws that Plaintiffs allege were violated in the commission of the act of international terrorism. Finally, § 2333 restricts claims to nationals of the United States injured in their person, property, or business.

---

[28]     *See, e.g.,* *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) , *vac'd on other grounds*, 543 U.S. 1097 (2005) (defendant convicted of money laundering in the United States and providing material support to Hezbollah).

[29]     *See, e.g.,* *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010).

[30]     *Gill v. Arab Bank, PLC* ("*Gill II*"), 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012).

## A. The Attack Was an Unlawful Action.

Plaintiffs must show that they were injured by unlawful actions—acts of international terrorism.[31] Plaintiffs will present evidence demonstrating that the Attack and the murders and injuries that occurred, both perpetrated and materially supported by Hezbollah, qualify as acts of international terrorism.

Section 2331, incorporated by reference into § 2333, defines "international terrorism" as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended--

    (i)     to intimidate or coerce a civilian population;

    (ii)     to influence the policy of a government by intimidation or coercion; or

    (iii)     to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

Plaintiffs will present evidence showing that Hezbollah planned and ordered "violent acts," including by use of gunfire and grenades, that injured them and their family members. Further, Hezbollah's provision of material support to AAH, including training, expert advice, facilities, weapons, explosives and transportation, were "acts dangerous to human life."[32]

---

[31]     *See Gill II*, 893 F. Supp. 2d at 553 ("On the first element—unlawful action—a plaintiff must prove it more probable than not that he or she was injured by 'an act of international terrorism.'").

[32]     *Boim v. Holy Land Found. for Relief & Dev.* ("*Boim III*"), 549 F.3d 685, 690 (7th Cir. 2008) (en banc). *See also Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 322 (E.D.N.Y. 2015) ("Completing a wire transfer generally cannot be described as 'violent' or 'dangerous to human life' in the colloquial sense. But other courts have concluded, and I agree, that providing material support to a terrorist organization is an act 'dangerous to human life.'").

Plaintiffs will show that Hezbollah, in planning and directing the Attack, violated the following "criminal laws of the United States" and will prove the elements required by each:

- 18 U.S.C. § 2332(a): "Whoever kills a national of the United States, while such national is outside the United States," whether that killing is murder under 18 U.S.C. § 1111(a) or voluntary or involuntary manslaughter under 18 U.S.C. § 1112(a);

- 18 U.S.C. § 2332(b): "Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States," where killing is defined as murder under 18 U.S.C. § 1111(a); and

- 18 U.S.C. § 2339A: "Whoever provides material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out" various crimes, including 18 U.S.C. §§ 2332 and 1203 (hostage taking). "Material support" includes, *inter alia*, property, services, money, training and expert advice.

Specifically, Plaintiffs will present evidence showing that Hezbollah directed AAH to kill American soldiers during the Attack and conspired with AAH to do the same. Hezbollah also provided material support for the Attack for the purpose of killing and kidnapping Americans. That material support included planning, assistance, training, funding, and equipment. The mental states associated with these crimes are discussed below at pages 18-19.

Plaintiffs will show that Hezbollah's role in planning and supporting the Attack "appears to be intended" to intimidate or coerce a civilian population or influence the policy or affect the conduct of a government—a showing required "in order to distinguish terrorist acts from other violent crimes."[33] "Appearance of intent" is an objective standard.[34] Further, knowingly providing material support to a terrorist attack objectively appears to be intended to intimidate.[35] Plaintiffs

---

[33]    *Boim III*, 549 F.3d at 694.

[34]    *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 (2d Cir. 2014) ("[t]he requirement to 'appear to be intended ...' does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions."); *Boim III*, 549 F.3d at 694 ("it is not a state-of-mind requirement; it is a matter of external appearance rather than subjective intent, which is internal to the intender.").

[35]    *See, e.g.*, *Boim III*, 549 F.3d at 694 ("donations [to a terrorist group] would 'appear to be intended . . . to intimidate'"); *Linde*, 97 F. Supp. 3d at 323 (same).

will provide expert testimony showing that the Attack and plot to kidnap American soldiers not only appeared, but was objectively and subjectively *designed*, to intimidate the United States civilian population and influence American policy by intimidation or coercion and to affect the American government's conduct.

Finally, Plaintiffs will show that the Attack occurred "outside the territorial jurisdiction of the United States," and its planning by Iraqi, Iranian, and Lebanese terror groups and targeting of the U.S. government "transcend national boundaries."

### B. Hezbollah Acted with the Requisite Mental State for Each of Plaintiffs' Claims.

Plaintiffs must present evidence "satisfy[ing] the state of mind requirement for liability under § 2333 and the statutes that it incorporates by reference."[36] Section 2333(a) claims require showing that defendants acted at least with criminal recklessness or a deliberate indifference to plaintiffs' well-being.[37] This is the same state of mind required for violations of § 2339A, which Plaintiffs' claim incorporates by reference. Section 2339A requires showing that a party providing material support to a terrorist organization "either knows that the organization engages in such [terrorist] acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."[38] Hezbollah materially supported AAH fully knowing that AAH engaged in terrorist activities targeting United States forces.

Although Plaintiffs are entitled to complete relief for their injuries because of Hezbollah's alleged violation of § 2339A, they have also made claims premised on Hezbollah's violations of

---

[36]      *Boim III*, 549 F.3d at 693.

[37]      *Id. See also Gill I*, 893 F. Supp. 2d at 503 ("to recover pursuant to the ATA's civil remedy provision, a plaintiff must prove that a defendant acted intentionally, knowingly, or recklessly").

[38]      *Boim III*, 549 F.3d at 693.

§§ 2332(a) and (b), which provide additional, independent grounds for relief. Section 2332(a) incorporates by reference 18 U.S.C. §§ 1111(a) and 1112(a), which require different mental states depending on the specific crime alleged—murder (an intent to kill with malice aforethought), voluntary manslaughter (an intent to kill or do serious bodily injury, or depraved-heart recklessness), and involuntary manslaughter (negligence).[39] Section 2332(b), which criminalizes attempts or conspiracies to commit murder under 18 U.S.C. § 1111(a) outside the United States, requires in relevant part showing an intent that a murder be committed by a co-conspirator.[40]

In planning the Attack, Hezbollah acted with an intent to kill American soldiers with malice aforethought (including by co-conspirators), intent to kill or do serious bodily injury to Americans, and deliberate indifference to the safety of anyone in the PJCC and the emotional well-being of their family members. For instance, the captured journal of Hezbollah's senior operative, Daqduq, includes instructions for "throwing charges" and "bombs" at U.S. soldiers in the PJCC, "shoot[ing] any soldier attempting to exit from" the PJCC, and "immediately kill[ing] the armed soldiers." It also included instructions to "secure" (i.e., kidnap) two officers in the PJCC officers' room.

## C.    Hezbollah's Actions Proximately Caused Plaintiffs' Injuries.

Plaintiffs must show that Hezbollah proximately caused their injuries.[41] To establish proximate causation in the ATA context, Plaintiffs must show that Hezbollah's actions were "a substantial factor in the sequence of responsible causation," and that the injury was "reasonably foreseeable or anticipated as a natural consequence."[42] Hezbollah's conduct leaves no doubt about

---

[39]     *See, e.g.*, *United States v. Serawop*, 410 F.3d 656, 666, 669 (10th Cir. 2005).

[40]     *See, e.g.*, *United States v. Robertson*, 473 F.3d 1289, 1293 (10th Cir. 2007).

[41]     *See, e.g.*, *Linde*, 97 F. Supp. 3d at 324 (finding that ATA claims require a showing of proximate causation).

[42]     *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)). *See also* *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 646 (S.D. Tex. 2011), *on reconsideration in part,* 7 F. Supp. 3d 668 (S.D. Tex. 2014) ("Foreseeability is the cornerstone of proximate cause, and in tort law, a

the foreseeability of Plaintiffs' injuries since they were not only "a natural consequence of the defendant's actions," but also the *intended* consequence of Hezbollah's actions.

Plaintiffs will present evidence showing that Hezbollah planned and directed the Attack, which directly and foreseeably injured Plaintiffs, all of whom were U.S. soldiers stationed at the PJCC or their family members. For instance, Hezbollah operatives were captured with documents showing detailed information on "soldiers' activities, shift changes and defenses" at the PJCC, which was "shared with the attackers," and Daqduq's 22-page memorandum, which "detailed the planning, preparation, approval process and conduct of the [Karbala] operation." The memorandum included specific instructions to kill and kidnap U.S. soldiers during the Attack. Plaintiffs will also show that Hezbollah provided AAH with material support, including money, equipment, advice, and training, which foreseeably enabled AAH to injure Plaintiffs. As stated above, the United States found that the Attack's scale was "well beyond the caliber associated with local terrorist or militia capabilities."

### D. Nationality and Injury

#### 1. Each of the Plaintiffs Is a National of the United States.

Section 2331 of the ATA defines nationals of the United States pursuant to § 1101(a)(22) of the Immigration and Nationality Act. Under that statute, "national of the United States" includes citizens of the United States.[43] Each of the Plaintiffs is and has been at all relevant times a citizen of the United States.[44]

---

defendant will be held liable only for those injuries that might have reasonably been anticipated as a natural consequence of the defendant's actions."). *Cf. Owens v. Republic of Sudan*, No. 14-5105, 2017 WL 3203263, at *28-32 (D.C. Cir. July 28, 2017) (unpublished).

[43]     8 U.S.C. § 1101(a)(22).

[44]     *See* Compl. ¶¶ 44-120.

### 2. Each of the Plaintiffs Was Injured in His or Her Person.

Personal injury claims under § 2333(a) include "the broadest possible range of damages," including "both pecuniary damages and . . . non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings."[45] Plaintiffs have brought claims for physical injuries of the wounded; wrongful death, which includes pain and suffering of the deceased (also called "survivorship"); and solatium (emotional injuries of witnesses to terrorist attacks and of family members of the wounded and killed). Plaintiffs will present evidence, including medical records and the testimony of Plaintiffs and medical experts, substantiating Plaintiffs' injuries.

### CONCLUSION

Based on the foregoing, Plaintiffs respectfully request a conference with the Court to create a plan for the presentation of evidence in an evidentiary hearing.

Dated this 3rd day of August, 2017

DEWSNUP, KING & OLSEN

_____/s/ Charles T. Conrad_____
DEWSNUP, KING & OLSEN
*Attorneys for Plaintiffs*

---

[45] *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 267 (D.R.I. 2004). *See also Lelchook v. Commerzbank AG*, No. 10 CIV. 5795, 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011) ("Congress meant to incorporate the full range of traditional tort principles into the ATA").